# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 21-cv-02281-DDD-KLM

RONALD RAYMOND ROGACKI,

      Plaintiff,

v.

JEFFERSON COUNTY, COLORADO[1];
WELLPATH, LLC;
JOHN O. BERTAGNOLLI, DDS, individually;
MONICA ALBERS, RN, individually;
COURTNEY SLOWEY, LPN, individually;
DAVID M. JACKSON, MD, individually; and
JOHN J. ARCHARD, MD, individually,

      Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through counsel, David Lane, Michael Fairhurst, and Liana Orshan of

KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Amended Complaint and Jury

Demand as follows:

---

[1] "Jefferson County, Colorado" is the correct name of the governmental entity Defendant. There is a split of opinion among some judges in this district and elsewhere. Some judges require that plaintiffs name the Board of County Commissioners and/or the sheriff in his/her official capacity to name a Colorado county as a Section 1983 defendant. If the Court in this matter ultimately requires Plaintiff to name as Defendant the "Board of County Commissioners of Jefferson County" and/or "the Sheriff in his/her official capacity" to sue Jefferson County, or some other entity in order to obtain municipal liability against Jefferson County, Plaintiff will substitute parties and this shall serve as notice to that/those putative Defendant(s).

## I.  INTRODUCTION

1.     Plaintiff Ronald Raymond Rogacki was incarcerated at the Jefferson County Jail ("JCJ") for approximately six months between August 2019 and January 2020. Throughout his incarceration, Mr. Rogacki suffered an obvious oral/sinus infection that caused him painful, often inescapable headaches; purulent, foul-smelling drainage from his nostrils; hearing and vision loss; dizziness, foul breath; and other serious symptoms.

2.     Mr. Rogacki obviously needed his remaining teeth to be extracted promptly in order for his sinus infection to be curable. He would continue to have a chronic, incurable sinus infection until his teeth were removed because the site of origin was his rotten teeth and gums. This presented a serious risk of harm to Mr. Rogacki about which the Defendants were aware.

3.     Yet, JCJ dentist Defendant Dr. John O. Bertagnolli showed deliberate indifference by denying Mr. Rogacki necessary dental care, including but not limited to the extraction of his teeth. As a result, Mr. Rogacki required follow-up care from a specialist at St. Anthony's Hospital in October 2019, as well as surgical intervention, in order to resolve his sinus infection.

4.     The Wellpath medical Defendants contracted to work at JCJ also failed to obtain necessary care for Mr. Rogacki despite his extensive notice to them of his serious and obvious medical needs, including but not limited to the need for his remaining teeth to be extracted in order for his sinus infection to be treatable. Mr. Rogacki accordingly suffered permanent damage to his maxillary sinuses.

5.     Defendants are liable for Mr. Rogacki's injuries, pain, suffering, and other damages under the Eighth Amendment to the United States Constitution for their deliberate indifference to Mr. Rogacki's obvious and serious medical needs.

## II.    JURISDICTION AND VENUE

6.      This action arises under the Constitution and laws of the United States, and is brought under 42 U.S.C. § 1983.

7.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8.      Jurisdiction supporting Plaintiff's claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988.

9.      This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado.

## III.    PARTIES

### Plaintiff

11.     At all times relevant to the subject matter of this litigation, Plaintiff Ronald Rogacki was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

12.     During the relevant time period, Mr. Rogacki was detained at JCJ.

13.     Mr. Rogacki is no longer in detention; therefore, no administrative or other exhaustion requirements apply to any of the legal claims asserted herein.

### Defendants

14.     Defendant Jefferson County is a political subdivision chartered under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. § 1983. Among other

things, Jefferson County, through the Jefferson County Sheriff's Office ("JCSO"), operates the Jefferson County Jail, located at 200 Jefferson County Parkway, in Golden, Colorado.

15.     At all relevant times, Defendant Jefferson County had a nondelegable duty to provide adequate medical and dental care to inmates and detainees at JCJ. Jefferson County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Wellpath LLC and its employees or contractors.

16.     Defendant Wellpath LLC ("Wellpath") is a Delaware corporation with its principal address located at 1283 Murfreesboro Road, Nashville, Tennessee, and its registered agent in Colorado, is Corporate Creations Network, Inc., located at 155 E. Boardwalk # 490, Fort Collins, Colorado.

17.     Wellpath has previously been known by several other names, including Correct Care Solutions ("CCS"), Correctional Healthcare Companies ("CHC"), and Correctional Healthcare Management ("CHM"). The corporate organization, leadership, and governance of Wellpath is substantially similar to that of its predecessor companies, and for all intents and purposes, it is the same company.

18.     At all times relevant to the subject matter of this litigation, Wellpath contracted with Jefferson County to provide staff and medical and dental services at JCJ. At all relevant times, Wellpath was responsible for the oversight, supervision, and training of all of the medical and dental staff at JCJ, including the Individual Defendants in this matter, and the medical and dental care of inmates housed at JCJ.

19.     At all relevant times, Wellpath was acting under color of state law and performing a central function of the state.

20.     Defendant Wellpath is a private corporation, and neither it nor any of its employees or contractors are entitled to any immunity under the Colorado Governmental Immunity Act ("CGIA") on Colorado state law claims or qualified or any other immunity on the federal law claims.

21.     Defendant Jefferson County and Defendant Wellpath are collectively referred to herein as the "Entity Defendants."

22.     At all times relevant to the subject matter of this litigation, Defendant Dr. John O. Bertagnolli, DDS was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a dentist at JCJ, who was employed by, or an independent contractor for, Wellpath.

23.     At all times relevant to the subject matter of this litigation, Defendant Monica Albers, RN was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Health Service Administrator and Registered Nurse at JCJ, who was employed by, or an independent contractor for, Wellpath.

24.     At all times relevant to the subject matter of this litigation, Defendant Courtney Slowey, LPN was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at JCJ, who was employed by, or an independent contractor for, Wellpath.

25.     At all times relevant to the subject matter of this litigation, Defendant Dr. David M. Jackson, MD was a citizen of the United States and a resident of and domiciled in Colorado

and was acting within the scope of his official duties and under color of state law in his capacity as a physician at JCJ, who was employed by, or an independent contractor for, Wellpath.

26.     At all times relevant to the subject matter of this litigation, Defendant Dr. John J. Archard, MD was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as a physician at JCJ, who was employed by, or an independent contractor for, Wellpath.

27.     Defendants Bertagnolli, Albers, Slowey, Jackson, and Archard are collectively referred to herein as "Individual Defendants."

## IV.     CERTIFICATE OF REVIEW

28.     Pursuant to C.R.S. § 13-20-602(3)(a), counsel certifies as follows:

    a.  Counsel has consulted with a medical professional with expertise in the areas of the alleged negligent conduct as set forth in Plaintiff's Complaint and Amended Complaint;

    b.  The medical professional who has been consulted has reviewed all known facts relevant to the allegations of negligent conduct as complained of in Plaintiff's Complaint and Amended Complaint;

    c.  Based upon review of such facts, the medical professional has concluded that the filing of the claims against Defendants does not lack substantial justification within the meaning of C.R.S. § 13-17-102(4); and

    d.  The medical professional who has reviewed all known facts relevant to the allegations of negligent conduct as contained in Plaintiff's Complaint and

Amended Complaint meet the requirements set forth in C.R.S. § 13-64-401.

## V. FACTUAL ALLEGATIONS

**A.** **Background regarding Mr. Rogacki's chronic sinus infection that was caused by an oral infection, including the individual Defendants' knowledge of the link between his oral and sinus infection.**

29.     In August 2019, Mr. Rogacki was incarcerated at JCJ as a post-conviction detainee.

30.     At the time, Mr. Rogacki was suffering from a chronic sinus infection that he had first contracted in November 2018 during a previous incarceration at JCJ.

31.     Mr. Rogacki had initially contracted the sinus infection secondary to a tooth and gum infection that spread into his sinuses.

32.     In May of 2019, Mr. Rogacki's primary care provider had documented that he had a left-sided oral abscess already in existence for six months, and that he had been treated with six rounds of antibiotics unsuccessfully. At that time, his doctor told him he had to get his teeth pulled and his sinus infection cured before he could address any of his other health needs, like knee replacement. The Individual Defendants were aware of these important facts at all relevant times because Mr. Rogacki told them and/or they were documented in his jail record that they reviewed or should have reviewed as part of their assessment and treatment of Mr. Rogacki.

33.     Moreover, it was obvious to any medical provider that Mr. Rogacki needed to have his remaining teeth extracted in order for his sinus infection to be treatable.

34.     Mr. Rogacki had already started this process of oral extractions at Comfort Dental prior to incarceration, and due to the timing and severity of the infection, could not complete it.

But he was aware that he needed to finish the process as soon as possible and went into jail planning to ask for further dental work immediately. That is exactly what he did.

35. Mr. Rogacki is allergic to penicillin products. He breaks out in a rash when taking amoxicillin, which therefore further limits antibiotic treatment options, as that is the number one drug of choice for oral and sinus infections. This also was documented in Mr. Rogacki's jail medical record that all of the Individual Defendants did or should have reviewed as part of their assessment and treatment of Mr. Rogacki.

36. Additionally, prior to his August 2019 incarceration, Mr. Rogacki had received a CT scan of his head that suggested he would require maxillary sinus surgery, and potential additional surgical procedures, to treat the damage caused by the infection. The CT scan showed worsening left-sided sinus disease, which was consistent with his reported symptoms, and his oral infection was worse on the left side. The Individual Defendants were aware of these facts at all relevant times because Mr. Rogacki told them and/or they were documented in his jail medical record that they reviewed or should have reviewed as part of their assessment and treatment of Mr. Rogacki.

37. When Mr. Rogacki arrived at JCJ in August 2019, the sinus infection obviously encompassed his jaw as well. He had an oral/sinus infection. As a result, **Mr. Rogacki could not receive the treatment necessary to treat the infection and heal his damaged sinuses and jaw until all of his teeth had been extracted. He would continue to have a chronic, incurable sinus infection until his teeth were removed because the site of origin was his rotten teeth and gums.** The Individual Defendants were aware of these critical facts at all relevant times because they were obvious, Mr. Rogacki told them, and/or they were documented in his jail

record that they reviewed or should have reviewed as part of their assessment and treatment of Mr. Rogacki.

38. **Oral infection like Mr. Rogacki's is serious and can even be deadly. Oral infection has proven links to the surrounding tissues (sinuses) and systemically (the entire body). Lack of prompt and appropriate treatment and cure for an oral infection can lead to immediate adverse effects as severe as sudden death, and lasting adverse effects such as heart disease, malnutrition, septic joints, and permanent sinus damage (in the case of a related sinus infection). All medical providers (doctors, nurses, dentist) know these things based on their training and experience. All the Individual Defendants were aware of the serious risks associated with failing to treat Mr. Rogacki's oral infection quickly and adequately at all relevant times.**

39. Mr. Rogacki had previously attempted to have all his teeth extracted; however, he had only been able to have his upper teeth and four of his lower teeth pulled before he began his August 2019 jail term. As the Individual Defendants knew, several obviously rotten teeth that needed to be removed promptly in order to properly treat his sinus infection remained in his mouth during his incarceration at issue at JCJ.

40. Over the course of his approximately six-month incarceration, from August 2019 through January 2020, Mr. Rogacki reported to JCJ staff his oral infection, his related sinus infection, and/or his need for additional treatment related to those serious and obvious medical needs no fewer than 25 times through the facility's healthcare request ("kite") and grievance procedures.

41.     Mr. Rogacki further complained about his oral infection and/or related sinus infection and requested treatment for those serious and obvious medical needs on numerous occasions when he spoke in person with JCJ medical providers, including but not limited to the Individual Defendants.

42.     Numerous members of the JCJ medical staff, including but not limited to the Individual Defendants, acknowledged Mr. Rogacki's oral infection and/or related sinus infection and/or his need for additional treatment in writing over the same time period.

43.     Mr. Rogacki's oral infection and related sinus infection—and the failure of JCJ medical staff to provide effective treatment to address them—foreseeably caused him to suffer painful, debilitating symptoms, including, at least, frequent, often daily drainage of foul-smelling pus from his nose; head rushes and whiteouts upon shifting position; frequent headaches and pressure on the left side of his head; an inability to maintain his weight; declining hearing in his left ear; and declining vision. The Individual Defendants were aware that Mr. Rogacki was suffering all of these symptoms indicative of a serious and obvious medical need that required prompt treatment at all relevant times.

44.     Unfortunately, Mr. Rogacki's sinus infection would never resolve, no matter how many antibiotics he was given, until the remaining teeth were pulled. The infection would experience minor improvements, but never completely go away, and always come back the same or worse as soon as antibiotics were stopped. The Individual Defendants were aware of this critical fact at all relevant times.

45.     Thus, to ***only*** prescribe antibiotics for his sinus infection, with the knowledge of his oral infection, rotten teeth, and history of **multiple** rounds of failed antibiotic use already

documented, as at least some of the Individual Defendants did here, was lazy, foreseeably

dangerous, and even foreseeably life-threatening to Mr. Rogacki.

46.     Medical knowledge of treating infection like Mr. Rogacki's dictates that the

correct antibiotic agent must be used to achieve resolution, but also that the underlying cause

(again, extracting Mr. Rogacki's rotten teeth in the instant case) must be addressed—neither of

which was done by any Individual Defendant in this case. A more detailed description of each

Individual Defendants' knowledge of Mr. Rogacki's serious and obvious medical needs and their

conscious disregard of his needs despite the severe medical risk presented to him follows.

**B.  Mr. Rogacki extensively reported his worsening oral/sinus infection and associated symptoms to the JCJ medical staff, including the Individual Defendants.**

47.     Mr. Rogacki first alerted JCJ staff to his serious oral/sinus infection and need for

care when, on August 27, 2019, he submitted a healthcare request indicating that he required a

soft dental diet because he had recently had some of his teeth extracted, and stating that he

planned to have the remaining teeth extracted next. Mr. Rogacki noted that he had lost

significant weight due to the infection, and that the infection had spread to his jawbone.

48.     Nurse Jayme Laws, RN responded that Mr. Rogacki would be scheduled to see

the dentist and that she would consult with the kitchen regarding Mr. Rogacki's diet.

49.     On September 1, 2019, Mr. Rogacki visited JCJ dentist Defendant Dr.

Bertagnolli. Defendant Bertagnolli's notes from the encounter state only that sutures were

removed from Mr. Rogacki's mouth. These sutures were from the extractions of some of Mr.

Rogacki's teeth prior to his incarceration at JCJ.

50.     Defendant Dr. Bertagnolli took no further action to treat Mr. Rogacki, despite

knowing that Mr. Rogacki needed his remaining teeth extracted to resolve his oral/sinus

infection, and despite knowing the serious and potentially life-threatening consequences of failing to expeditiously extract his teeth.

51.     Thus, Defendant Bertagnolli did not address any of Mr. Rogacki's glaring and serious medical issues that any competent dentist should have recognized and immediately addressed, including but not limited to Mr. Rogacki's ongoing infection and the related documented and known plan to extract the rest of the teeth.

52.     At a bare minimum, Defendant Bertagnolli should have initiated a plan or referral at this time to remove the rest of Mr. Rogacki's teeth. Because that was deliberately not done nor documented, Mr. Rogacki's pain and underlying serious medical condition foreseeably continued to worsen. Defendant Bertagnolli consciously disregarded a substantial and unjustifiable risk that he knew or should have known would cause harm to Mr. Rogacki.

53.     On September 2, 2019, Mr. Rogacki submitted a healthcare request advising that there was a serious problem with his left sinus that the medical staff at JCJ had failed to take seriously or treat appropriately. **Mr. Rogacki stated that his primary care provider had advised him that nothing could be done for the sinus infection until his teeth were pulled**, and that it had taken him the entirety of his brief release from JCJ between May and August 2019 to get his upper teeth pulled.

54.     On September 2, 2019, Mr. Rogacki submitted another healthcare request stating that Lutheran Hospital had contacted his wife to inquire as to whether Mr. Rogacki had yet been seen by the ear, nose, and throat ("ENT") specialist to whom he had been referred prior to his August 2019 incarceration. He explained that the referral was occasioned by a change in his left sinus passage detected by the CT scan. Mr. Rogacki stated that medical providers at Lutheran

12

Hospital had diagnosed him with a sinus disease. He advised that he was suffering from head rushes and whiteouts, and that his condition was growing worse by the day.

55. Mr. Rogacki also submitted a grievance on September 2, 2019, concerning the lack of care he had received for his ongoing sinus infection, again noting that Lutheran Hospital had contacted his wife regarding whether he had seen the ENT. Mr. Rogacki added that the discharge and drainage of pus from his nose, his headaches, and his loss of vision and hearing— all symptoms of the oral/sinus infection—continued to worsen.

56. Defendant Nurse Albers first became aware of Mr. Rogacki's September 2, 2019, grievance by no later than the middle of September.

57. Yet, Defendant Nurse Albers deliberately or recklessly failed to respond at all to Mr. Rogacki's September 2, 2019, grievance until over a month later on October 8, 2019, at which point she simply commented (without apparent relevance to Mr. Rogacki's stated grievance) that Mr. Rogacki had seen the dentist on September 1 and September 8, 2019, for suture removal, and falsely asserted that Mr. Rogacki declined an additional dental appointment on September 29, 2019.

58. Defendant Albers did nothing to validate that Mr. Rogacki's needs had been met or resolved by his visits to the dentist and ENT. To the contrary, Defendant Albers deliberately disregarded Mr. Rogacki's outstanding referrals to outside medical providers and documented plan of care that was essential (e.g., the pressing medical need to have the rest of his teeth removed as soon as possible in order to avoid serious and potentially life-threatening complications) despite being aware of them. It was her job to facilitate and ensure that the follow up care was promptly scheduled and received. She deliberately failed to do these things for Mr.

Rogacki despite being aware of his serious condition (more fully described above), aware of his serious associated symptoms (more fully described above) and aware of the serious risks associated with failing to appropriately treat his condition (more fully described above).

59. To be clear, Mr. Rogacki's need for treatment and care from an ENT likely existed because the Defendants failed to cause Mr. Rogacki's remaining teeth to be extracted in a timely manner. Had the Defendants merely enabled him to receive needed dental care in a timely manner, then the ENT care, while perhaps still necessary, would have been much less time-sensitive at a minimum. Mr. Rogacki needed ENT surgery because of his chronic oral/sinus infection that the individual Defendants had, with deliberate indifference, failed to appropriately address.

60. Defendant Albers and other JCJ medical staff members also frequently failed to address Mr. Rogacki's grievances and healthcare requests in a timely manner, despite being aware of the obviously urgent nature of his oral/sinus infection, despite being aware of the content of his grievances, and despite being aware of the insufficient and plainly incorrect care that he received at JCJ for the infection.

61. That undue delay occurred even though the JCJ grievance forms Mr. Rogacki used to submit his concerns announced in bold font at the top of the form, "[o]nce submitted, JCSO staff have ten (10) business days to respond to your grievance."

62. On September 4, 2019, Mr. Rogacki submitted a grievance stating that his grievances were going unanswered. On December 4, 2019—three months after the submission of Mr. Rogacki's September 4 grievance—Defendant Albers deliberately indifferently responded to

the effect that all of Mr. Rogacki's grievances had been answered as of "***that date***," "that date" being December 4th.

63.     On September 6, 2019, Mr. Rogacki visited Defendant Dr. Jackson at JCJ. Defendant Dr. Jackson noted in his assessment that there was "CT scan evidence of sinusitis prior to upper mouth multiple tooth extraction now with slowly resolving nasal drainage."

64.     Defendant Dr. Jackson consciously disregarded the obvious fact that Mr. Rogacki's sinusitis was not resolving, slowly or otherwise, and that Mr. Rogacki obviously had an urgent need for treatment.

65.     Defendant Dr. Jackson declined to start Mr. Rogacki on antibiotics, stating that he favored a "watchful waiting" approach.

66.     Defendant Dr. Jackson knew at the time that Mr. Rogacki's symptoms associated with a chronic oral/sinus infection (such as severe and recalcitrant pain, foul-smelling pus from his nose; head rushes and whiteouts upon shifting position; frequent headaches and pressure on the left side of his head; an inability to maintain his weight; declining hearing in his left ear; and declining vision) were not resolving or improving, and yet deliberately did nothing to address them.

67.     As Defendant Jackson knew, the correct thing to do at this time was to, at a minimum, be sure that the dental extractions were scheduled as soon as possible. Dr. Jackson knew that failing to do so could cause Mr. Rogacki to suffer severe and permanent adverse effects, such as permanent sinus damage, heart disease and even sudden death. Still, he failed to do anything to ensure Mr. Rogacki received necessary dental care.

68.    On September 7, 2019, Mr. Rogacki submitted a healthcare request stating that he needed to see a medical provider about his sinus disease and noting that when he had previously seen the provider, the provider had stated that he was unable to address all of Mr. Rogacki's numerous medical issues at once, apparently including the sinus disease. He also requested to see the dentist concerning his remaining teeth that needed to be removed.

69.    JCJ and Wellpath nurse Sarah Lindstrom, LPN responded that Mr. Rogacki had been scheduled to see the dentist and would receive salt twice per day for a week.

70.    On September 8, 2019, Mr. Rogacki again visited Defendant Dr. Bertagnolli. Once more, the only reported action taken by Defendant Bertagnolli was to remove sutures from Mr. Rogacki's mouth.

71.    In fact, even though Defendant Dr. Bertagnolli knew that Mr. Rogacki could not receive the medical treatment necessary to resolve his sinus infection until his remaining teeth had been removed, and Mr. Rogacki also repeatedly requested that his remaining teeth be extracted, JCJ dentist Defendant Dr. Bertagnolli *never* extracted Mr. Rogacki's teeth or allowed him to see an outside dentist to perform the necessary extractions.

72.    Defendant Dr. Bertagnolli deliberately took no action in furtherance of the extractions despite knowing that Mr. Rogacki was seriously ill due to his sinus infection caused by an oral infection, and could in fact suffer severe and permanent adverse effects if the sinus infection was not expeditiously resolved, such as permanent sinus damage, incurable heart disease, and even sudden death.

73.     On September 11, 2019, Mr. Rogacki submitted a healthcare request stating that that his sinus infection was not improving and that his dizzy spells and head rushes were worsening.

74.     JCJ and Wellpath nurse Tracie L. Hensley, RN responded to the September 11th healthcare request that Mr. Rogacki had been tasked to see a provider regarding his concerns.

75.     On September 12, 2019, Nurse Hensley spoke with Mr. Rogacki regarding his September 11th healthcare request. Nurse Hensley told Mr. Rogacki to move slowly in order to prevent head rushes.

76.     On September 12, 2019, Mr. Rogacki was seen at JCJ by Defendant Dr. Archard.

77.     Defendant Dr. Archard acknowledged the history of Mr. Rogacki's sinus infection developing in connection with dental problems and noted that Mr. Rogacki reported suffering head rushes when he moved or changed position rapidly, the purulent discharge from Mr. Rogacki's left nostril, and the reported history of ineffectiveness in antibiotics to treat the sinus infection.

78.     Though Defendant Dr. Archard observed Mr. Rogacki's serious condition and assessed Mr. Rogacki as suffering from chronic left maxillary sinusitis and right lower gum inflammation, he recklessly offered little to address these issues; his charted "plan" for Mr. Rogacki included a nebulous "prn tx [per needed treatment] for sinuses" and "f/u [follow up] with dentist."

79.     Defendant Archard deliberately took no steps to ensure Mr. Rogacki received necessary follow-up care, such as the removal of his remaining teeth.

80.     On September 16, 2019, Mr. Rogacki was seen by JCJ and Wellpath Physician Assistant Eric A. Paulson.

81.     PA Paulson noted Mr. Rogacki's report of chronic sinus pain and purulent discharge, along with Mr. Rogacki's connected dental issues. He also indicated that Mr. Rogacki had received a CT scan in August 2019 that revealed a maxillary sinus fracture and assessed Mr. Rogacki as suffering from chronic sinusitis.

82.     PA Paulson prescribed Mr. Rogacki a 21-day course of Bactrim, an oral antibiotic, and referred Mr. Rogacki to see an outside ENT due to the duration of his sinus infection symptoms and the maxillary sinus fracture detected on the August 2019 CT scan.

83.     On September 13, 2019, Mr. Rogacki submitted a healthcare request stating that his sinus infection had now lasted approximately eleven months, and that he was blowing pus out of his nose. Mr. Rogacki stated that the sinus infection required the immediate attention of the ENT specialist to whom Lutheran Hospital had referred him. Mr. Rogacki again noted that he had filed several grievances regarding this issue that had gone unanswered.

84.     Defendant Albers responded to Mr. Rogacki's September 13, 2019, healthcare request nearly three months later on December 4, 2019 (despite being aware of it by no later than approximately the end of September), stating that an unnamed doctor had diagnosed Mr. Rogacki with chronic sinusitis and had ordered "as needed" treatment for his sinuses and to follow up with the dentist. Defendant Albers provided the irrelevant observation that the dentist had removed Mr. Rogacki's sutures in September 2019 and noted that Mr. Rogacki had seen an offsite ENT specialist in October of 2019.

85. Yet, Defendant Albers failed to acknowledge the recommendations of the offsite ENT specialist that Mr. Rogacki return for follow-up visits and likely surgery on his damaged sinuses (despite being aware of them)—obviously necessary procedures that JCJ medical staff, including Individual Defendants, did not provide.

86. Defendant Albers merely reiterated what had already been done for Mr. Rogacki and failed to take any action whatsoever to address his serious and obvious medical needs related to his chronic and ongoing oral/sinus infection about which she was aware, despite knowing the potentially severe medical consequences of failing to treat a chronic oral/sinus infection expeditiously and appropriately like Mr. Rogacki's.

87. On September 13, 2019, Mr. Rogacki submitted a Watch Supervisor Request Form in which he indicated that eight of his grievances had gone unanswered and that his sinus infection had developed into a more serious sinus disease per the CT scan. Mr. Rogacki concluded his request with a plaintive "[p]lease help me." Rather than provide any help, the unsigned response from JCJ staff simply directed Mr. Rogacki to submit a medical request—the very process that had thus far and would continue to fail Mr. Rogacki in his efforts to receive the obviously necessary treatment for his serious oral/sinus infection.

88. On September 20, 2019, Mr. Rogacki submitted a grievance again complaining that his grievances were frequently ignored.

89. JCJ Sergeant Betka responded that, because Mr. Rogacki's unanswered grievances concerned medical and kitchen issues, Sgt. Betka could not respond, but advised Mr. Rogacki that the medical grievances had been forwarded to Defendant Albers.

90.     On September 24, 2019, Mr. Rogacki submitted a healthcare request asking whether he was on the list to see the dentist and inquiring as to what steps were being taken to address his sinus disease. Mr. Rogacki stated that the sinus infection remained despite his treatment with the antibiotic Bactrim.

91.     A JCJ medical staff member with the initials "C.E." responded to the September 24th healthcare request that Mr. Rogacki did not appear to be on the dental list but had an appointment with an outside referral in the near future.

92.     On September 25, 2019, Nurse Katie Coyle, RN saw Mr. Rogacki in response to a kite concerning his need to have his remaining teeth pulled and obtain dentures. Nurse Coyle tasked Mr. Rogacki to be seen by the dentist.

93.     On September 29, 2019, Defendant Bertagnolli falsely reported that Mr. Rogacki had declined a dental appointment. As stated above, Mr. Rogacki never declined a dental appointment during his incarceration at JCJ. Defendant Bertagnolli knew this at all relevant times.

94.     On September 30, 2019, Mr. Rogacki submitted a healthcare request stating that, among other medical concerns, he still was suffering from the sinus infection and its attendant head rushes.

95.     Defendant Nurse Slowey responded to the September 30th healthcare request, asserting that the health issues Mr. Rogacki described did not require any medical treatment in the view of the JCJ medical staff. Yet, plainly, his serious and chronic oral/sinus infection required prompt medical treatment.

96.     On October 1, 2019, Mr. Rogacki submitted a healthcare request asking to see PA Paulson to address his sinus disease. Defendant Slowey merely responded that Mr. Rogacki had been tasked to see a provider, which could take as long as two weeks. In the meantime, Mr. Rogacki foreseeably continued to endure serious and painful symptoms and the worsening of his condition.

97.     On October 1, 2019, Defendant Slowey entered a chart note that included mention of Mr. Rogacki's "[c]hronic sinus infections/dental infections."

98.     On October 2, 2019, Defendant Slowey entered a chart note concerning Mr. Rogacki's medical history that stated, "patient has chronic sinus and dental problems he has been seen for on numerous occasions."

99.     A second chart note from Defendant Slowey on October 2, 2019, falsely stated that all of Mr. Rogacki's chronic health problems had been addressed. In so stating, Defendant Slowey intentionally or recklessly disregarded Mr. Rogacki's medical history and medical condition about which she was aware, including but not limited to his chronic sinus infection and related serious medical need for his teeth to be extracted very soon.

100.    Despite the obvious severity of Mr. Rogacki's sinus and dental problems, and his obvious need for medical treatment of the same, Defendant Slowey deliberately or recklessly categorized her entries regarding the "chronic sinus infections/dental infections" as "Conditions Not Requiring Medical Treatment."

101.    Defendant Slowey knew at the time that Mr. Rogacki had a documented history of a chronic sinus infection that could not be cured by antibiotic treatment alone.

102.     Defendant Slowey knew at the time that Mr. Rogacki needed to have his remaining teeth extracted as soon as possible in order to for Mr. Rogacki's sinus infection to be curable.

103.     Defendant Slowey knew at the time that failing to address Mr. Rogacki's ongoing oral/sinus infection expeditiously and appropriately could potentially have medically-severe consequences for him (further described above).

104.     Despite all of this, Defendant Slowey did nothing whatsoever to enable Mr. Rogacki to receive necessary care for his oral/sinus infection despite having the ability and responsibility to procure such care for him.

105.     On October 3, 2019, Mr. Rogacki was finally taken to see an ENT at St. Anthony's Hospital.

106.     The ENT examined Mr. Rogacki and conducted a nasal endoscopy. The ENT observed that Mr. Rogacki had a left septal deviation with 80% obstruction, as well as purulence coming from behind the middle turbinate in Mr. Rogacki's nose. The ENT diagnosed Mr. Rogacki with chronic left side maxillary sinusitis and a deviated septum.

107.     The ENT noted that she anticipated Mr. Rogacki would require maxillary sinus surgery and possible septoplasty, that she would consult with a surgeon on the matter, and that she would call the jail once she had had the opportunity to review the imaging of Mr. Rogacki's sinuses taken prior to incarceration.

108.     Yet, despite being on notice that surgery was likely necessary, no Individual Defendant or other JCJ medical employee attempted to contact the ENT to confirm that surgery should move forward.

109. On October 3, 2019, JCJ and Wellpath Nurse Christina Messer, RN scheduled Mr. Rogacki to see Defendant Dr. Patel for an "Outpatient referral follow-up" two weeks after the October 3rd ENT appointment.

**C. Defendants failed to provide Mr. Rogacki with the obvious and necessary treatment to address his known and serious medical issues from the sinus infection.**

110. Despite the ENT's recommendations about which the Individual Defendants were aware, and Mr. Rogacki's continued notification of the Individual Defendants throughout the remainder of his incarceration about his serious and obvious medical needs related to his oral/sinus infection (including the necessity of having his teeth extracted), these Defendants still failed to provide him with the care he obviously required in order to resolve the oral/sinus infection, prevent additional foreseeable damage to his sinuses, and end his painful and debilitating symptoms about which they were aware.

111. On October 6, 2019, Defendant Slowey entered a chart note indicating that Mr. Rogacki had advised her that he was suffering a "sinus disease," as he had himself been advised at the October 3, 2019, ENT referral appointment. Defendant Slowey deliberately indifferently noted that she had "educated" Mr. Rogacki that his complaint was not a medical condition that required medical intervention.

112. In addition to opining about a medical issue that clearly was outside of her scope of practice, Defendant Slowey was obviously wrong in asserting that Mr. Rogacki did not have a medical condition that required treatment, as demonstrated by Mr. Rogacki's medical records that she did or should have reviewed, along with his obvious and serious medical needs that he presented to her (e.g., painful, often inescapable headaches; purulent, foul-smelling drainage from his nostrils; hearing and vision loss; dizziness, foul breath; and other symptoms).

113.     Defendant Slowey knew based on her medical training and experience that an untreated sinus infection that is worsening (as she knew Mr. Rogacki's was) could have medically-severe and potentially even fatal consequences (further described above), and that Mr. Rogacki's sinus infection was indeed worsening and extremely unlikely to resolve without further medical treatment (including but not limited to the removal of his remaining teeth). She deliberately did nothing to provide or procure such treatment for him.

114.     On October 7, 2019, Mr. Rogacki submitted a healthcare request asking to see a provider for a variety of medical issues including his sinus infection, which he indicated was causing him severe head rushes.

115.     A Wellpath Licensed Practical Nurse with the initials "C.R." responded to the October 7, 2019, healthcare request on the same day, and indicated only that Mr. Rogacki had been to the medical unit that day as well.

116.     On October 8, 2019, Mr. Rogacki submitted a healthcare request in apparent reply to "C.R."'s response to his October 7, 2019, healthcare request. Mr. Rogacki stated that the medical assistance he had received on October 7, 2019, had not been helpful, and that he needed to see PA Paulson in order to find out whether he would see a dentist.

117.     Defendant Nurse Slowey responded to Mr. Rogacki's October 8th healthcare request by stating that Mr. Rogacki had been moved to SHU (the special housing unit, colloquially known as "solitary confinement") for observation. Obviously, the fact of Mr. Rogacki's move to the SHU was irrelevant to his medical condition and necessary treatment, and JCSO officers observing Mr. Rogacki in the SHU would do nothing to advance his medical treatment. Defendant Slowey again did nothing to provide medical care for Mr. Rogacki or

procure medical care for him despite (still) knowing he had urgent and serious medical needs related to his chronic and worsening oral/sinus infection that presented a serious risk of harm to him.

118.    On October 9, 2019, Mr. Rogacki submitted a healthcare request asking once more to see PA Paulson concerning his sinus disease. Mr. Rogacki also noted that his antibiotics had expired, and that his symptoms now included an earache as well as worsening pus and "sinus drip" from the sinus infection.

119.    On October 10, 2019, Mr. Rogacki submitted yet another healthcare request asking to see "the provider named Eric" about his sinus disease. Mr. Rogacki again stated that his antibiotics had run out days earlier, and that he felt worse with every passing day.

120.    A Wellpath employee with the initials "C.E." responded to the October 10th healthcare request that Mr. Rogacki was scheduled for a doctor's appointment the same week.

121.    On October 11, 2019, Mr. Rogacki submitted a grievance extensively explaining his ongoing healthcare issues, including both the persistent sinus infection and his difficulty in getting his teeth extracted, as well as his need for sinus surgery to correct the damage caused by the medical staff's failure to adequately treat the infection. He indicated that his sinus infection was ongoing because the jail had failed to pull his teeth in a timely manner. Mr. Rogacki also noted that responses to his previous grievances had contained incorrect information about his previous medical care.

122.    JCJ medical staff deliberately ignored and/or disregarded Mr. Rogacki's October 11, 2019, grievance entirely, and did not offer any response at all until nearly *six months later*,

on April 1, 2020. The unsigned April 1, 2020, response simply stated that Mr. Rogacki was no longer in the custody of the Jefferson County Sheriff's Office.

123. On October 14, 2019, Mr. Rogacki was seen again by Defendant Dr. Archard. Defendant Archard reported that Mr. Rogacki again notified him of his history of problems with his left upper jaw and teeth, and the related sinus problems he was suffering. Defendant Archard noted that Mr. Rogacki continued to have nasal congestion and green discharge from the left naris.

124. Defendant Archard also noted that Mr. Rogacki had been seen by the ENT specialist, had a scope of his nose performed, and had been told that he would need to have his bottom teeth pulled.

125. Defendant Archard's assessment of Mr. Rogacki included chronic left maxillary sinus symptoms, "unchanged," and his "[p]lan" for Mr. Rogacki included "f/u with ENT as planned." However, Defendant Archard deliberately failed to take any steps to ensure that Mr. Rogacki did in fact follow up with an ENT.

126. Moreover, Defendant Archard deliberately failed to take any steps at all to address Mr. Rogacki's dental/oral care, even though he knew that it was imperative that Mr. Rogacki's dental condition be resolved quickly (e.g., Mr. Rogacki needed to have his remaining teeth extracted as soon as possible) in order for his sinus infection to be treated appropriately

127. On October 17, 2019, Ritika J. Patel, MD reviewed the notes from Mr. Rogacki's ENT appointment two weeks earlier. Dr. Patel reported that the ENT suspected chronic maxillary sinusitis but also discovered Mr. Rogacki had "some purulents [sic]" upon an endoscopic examination.

128.     Dr. Patel also reported that the ENT had recommended ongoing antibiotics (though no one had in fact prescribed ongoing antibiotics for Mr. Rogacki) and would follow up for possible sinus surgery.

129.     On October 31, 2019, Mr. Rogacki submitted a healthcare request indicating that his sinus disease had persisted and was "kicking [his] butt." He also noted that his worsening symptoms included blurred vision, deafness of the left ear, and head rushes and dizzy spells. Mr. Rogacki asked why it was taking so long for him to receive a follow-up appointment with the doctors at St. Anthony's Hospital, and simply and correctly stated, "This is a bad infection of my head."

130.     Nurse Breann Friedrich responded to Mr. Rogacki's October 31 healthcare request that the medical staff was waiting for an outside appointment to be scheduled but provided no further detail.

131.     On November 9, 2019, Mr. Rogacki submitted a healthcare request stating that he had never been called for the dentist, nor had he refused such a call; he also noted that his medical grievances had not been answered timely, and that he had signed an authorization to allow JCJ staff to retrieve his medical imaging records from the outside dentist office at which he had previously been treated.

132.     Wellpath Nurse Nicole Montano, LPN responded to Mr. Rogacki's November 9th healthcare request that Mr. Rogacki had been scheduled to be seen by the dentist to be evaluated.

133.     On November 10, 2019, Defendant dentist Dr. Bertagnolli saw Mr. Rogacki again, and Mr. Rogacki once again requested that he be allowed to have his teeth pulled so that he could receive the necessary care for his sinus infection. Despite the patent deterioration of Mr.

Rogacki's condition, Defendant Bertagnolli reported that he saw "no reason" why Mr. Rogacki should be allowed to have his teeth pulled and added that "[his] opinion [was that Mr. Rogacki could] wait till [sic] his time is up."

134.    **Remarkably, when Mr. Rogacki had previously been incarcerated in JCJ in April 2019, Defendant Bertagnolli had opined that Mr. Rogacki needed a full-mouth extraction. Thus, a full seven months prior to Defendant Bertagnolli's refusal to obtain a full-mouth extraction, Defendant Bertagnolli had known that this was the exact treatment that Mr. Rogacki's serious medical condition required.** His failure to obtain this treatment for Mr. Rogacki in November 2019 despite his knowledge that Mr. Rogacki needed such treatment is the definition of deliberate indifference.

135.    On November 13, 2019, Mr. Rogacki submitted a healthcare request stating that his sinus disease was now moving into his right sinus cavity and throat, that swallowing caused him pain, that his nose would not stop running, and that he continued to suffer from the head rushes. Mr. Rogacki also stated that the pus and "snot" were "kicking [his] butt."

136.    JCJ and Wellpath nurse Steven Nadeau, LPN responded to Mr. Rogacki's November 13th healthcare request that Mr. Rogacki had been scheduled to see a provider regarding his sinus problems and that salt was available for gargling at med pass.

137.    On November 14, 2019, Mr. Rogacki was seen by Hunaif Dar, MD. Mr. Rogacki advised Dr. Dar that his sinus drainage had worsened and that he was suffering from headaches as a result of the ongoing infection. He further advised Dr. Dar of the recent removal of some of his teeth, and that he was supposed to see the ENT for follow-up and potential surgery.

138.     Dr. Dar included "recurrent sinusitis" and "history of chronic sinusitis" in his assessment of Mr. Rogacki's condition.

139.     Dr. Dar's written plan for Mr. Rogacki included a two-week prescription of the antibiotic Doxycycline and "ENT follow up."

140.     On November 21, 2019, Mr. Rogacki was seen again by Defendant Dr. Jackson.

141.     As a medical professional, Defendant Jackson did or certainly should have reviewed Mr. Rogacki's pertinent medical records as part of his evaluation of Mr. Rogacki. The records that were readily available to him clearly documented Mr. Rogacki's chronic and worsening sinus infection and numerous ongoing symptoms of such an infection (described above), along with the inadequacy of medical interventions undertaken on his behalf to date (such as the administration of antibiotics).

142.     Defendant Jackson was also aware of Mr. Rogacki's relevant medical history based on his previous meeting with him in September 2019, including the need for his remaining teeth to be extracted very soon in order for his chronic sinus infection to be curable.

143.     Defendant Jackson's report of his appointment with Mr. Rogacki included Mr. Rogacki's complaint of global weakness as well as dizziness "due to current sinus dz [disease]."

144.     Defendant Jackson additionally noted in his assessment of Mr. Rogacki that Mr. Rogacki was suffering from sinusitis and was presently being treated with Doxycycline.

145.     Defendant Jackson also indicated in his note that an ENT referral for Mr. Rogacki was "pending." It is unclear why Defendant Jackson believed that Mr. Rogacki had a "pending" follow-up appointment with the ENT, as no such appointment had been scheduled.

146. In any event, like the other Wellpath and JCJ providers who had recently seen Mr. Rogacki, Defendant Jackson's knowledge of Mr. Rogacki's serious condition and alarming symptoms should have, but did not, motivate him to obtain an immediate consultation with the ENT **and dentist** for Mr. Rogacki.

147. As discussed, Defendant Jackson knew that Mr. Rogacki needed to see a dentist as soon as possible in order for his remaining teeth to be extracted. Defendant Jackson knew that this was the only way for Mr. Rogacki's chronic and worsening sinus infection to be cured.

148. Defendant Jackson knew that, if Mr. Rogacki's teeth were not promptly extracted, Mr. Rogacki could suffer severe, irreversible, and even fatal medical consequences (further described above).

149. Despite all of his knowledge, Defendant Jackson deliberately did absolutely nothing to ensure that Mr. Rogacki received appropriate medical care.

**D. Months after Mr. Rogacki was diagnosed with chronic sinusitis and told he likely needed surgery, Defendants still took no steps to secure the necessary treatment.**

150. On December 3, 2019—two months after Mr. Rogacki had seen the ENT, during which none of the Individual Defendants nor any other JCJ medical staff member took any steps to obtain a follow-up appointment for him—Mr. Rogacki submitted a healthcare request in which he stated that his sinus disease was again worsening and that his antibiotics had run out approximately a week earlier. Mr. Rogacki also noted that his headaches and dizzy spells had worsened, and that the damage to his sight and hearing had also worsened.

151. Mr. Rogacki further noted that it had been two months since he had seen the outside ENT specialist, and that he still had not had a follow-up appointment.

152.    On December 4, 2019, Mr. Rogacki submitted a grievance complaining that his medical grievances and kites had gone unanswered. Mr. Rogacki again explained that he had a chronic sinus disease that dated back over a year, and that his sinus disease had resulted from a tooth infection and that his teeth needed to be extracted in order to treat the sinus infection.

153.    Defendant Albers responded to Mr. Rogacki's December 4th grievance the same day, finding the grievance "unfounded." In asserting this absurd conclusion that was unequivocally refuted by Mr. Rogacki's obvious medical needs about which she was aware, Defendant Albers noted without relevance that Mr. Rogacki had seen a mid-level provider for treatment of an infection from April to May (during a previous stint at the JCJ), and that a dentist had seen him on November 10, 2019, at which time Mr. Rogacki had requested to have his teeth extracted and dentures made. Defendant Albers cursorily asserted that the extraction was not "required" and could be completed upon Mr. Rogacki's release. She knew that assertion was false based on her knowledge of Mr. Rogacki's serious medical condition.

154.    Defendant Albers was aware of the connection between Mr. Rogacki's still untreated dental problems and his ongoing and worsening sinus infection. She by now had been aware of Mr. Rogacki's serious and obvious needs related to his ongoing sinus infection for months. Defendant Alberts nonetheless took no action to address Mr. Rogacki's plainly legitimate concerns about his oral/sinus infection, even though she knew that Mr. Rogacki was not currently receiving any appropriate treatment for the persistent symptoms, and that he was not scheduled to receive the treatment he knew he needed (e.g., teeth extraction) at any relevant time.

155.    On December 6, 2019, Mr. Rogacki submitted a grievance stating that he needed

to see the doctor concerning his sinus disease. He stated that multiple courses of antibiotics had not resolved the infection, and that his sinuses were still filling with pus.

156. A JCJ and Wellpath staff member with the initials "K.R." responded to Mr. Rogacki's December 6th healthcare request that they had spoken with the provider the same day, and that an outpatient referral had been sent. No such outpatient appointment ever manifested.

157. On December 16, 2019, Mr. Rogacki submitted a healthcare request stating that his sinus disease was "literally kicking [his] butt." Mr. Rogacki stated that he now was suffering continuous headaches on both sides of his upper sinus cavities, and that he was suffering head rushes even with minor changes in position. Mr. Rogacki stated that his outside ENT appointment had been cancelled and requested to see a JCJ doctor because he did not believe that he would ever be allowed to see the outside ENT.

158. Nurse Friedrich responded to the December 16th healthcare request, stating that Mr. Rogacki would be started on Zyrtec to "help with nasal complaints" and that he had been rescheduled for his outpatient referral.

159. On December 16, 2019, Nurse Friedrich entered a chart note that Mr. Rogacki had a chronic complaint of cold/allergy symptoms dating back the "last couple of months," including a stuffy nose, headache, and pain with pressure on the forehead and cheeks.

160. On December 17, 2019, Mr. Rogacki submitted a healthcare request correctly stating that he had a sinus disease rather than an allergy issue, and that he therefore did not wish to take Zyrtec.

161.     Defendant Albers responded and stated that Mr. Rogacki would be seen concerning his sinus issues pursuant to a previous healthcare request, and that, contradicting JCJ's prior communication to Mr. Rogacki, Mr. Rogacki had not actually been assigned Zyrtec.

162.     Yet again, Defendant Albers did nothing to medically address Mr. Rogacki's serious and obvious medical needs about which she remained aware (needs that are detailed above in the paragraphs describing her knowledge of Mr. Rogacki's increasingly dire medical situation related to his chronic oral/sinus infection).

163.     On December 17, 2019, Mr. Rogacki submitted a grievance stating that he had been told by the doctors at St. Anthony's in October that he had a sinus disease, and that follow-up appointments with the outside ENT had now twice been cancelled. He again stated that he had had continuous headaches and pus drainage as a result of the sinus issue, and that he was suffering dizzy spells when he squatted or lay down.

164.     JCJ medical staff, including Individual Defendants, deliberately ignored the December 17th grievance, despite the alarming and potentially emergent nature of Mr. Rogacki's described symptoms. The unsigned response to the grievance, dated May 22, 2020 (over five months after the grievance was submitted), states only, "[i]nmate released from JCSO."

165.     On December 17, 2019, Mr. Rogacki submitted another healthcare request asking to see the doctor about his sinus disease. Mr. Rogacki expressed his frustration with the JCJ medical staff's repeated promises to refer him to an ENT at St. Anthony's Hospital, only to be later told that no appointment had been made.

166.     JCJ and Wellpath Nurse Rebecca A. Strong, LPN, responded to the December 17th healthcare request that Mr. Rogacki had been referred to a provider.

167.     On December 18, 2019, Nurse Strong spoke to Mr. Rogacki; Mr. Rogacki advised her that he had a chronic sinus infection and that the treatment he had received did not help to resolve the issue. He also told Nurse Strong about his previous visit with the ENT in early October.

168.     On December 18, 2019, Nurse Strong made a chart entry noting that Mr. Rogacki was suffering from frequent sinus infections and further noted that he was experiencing "sinus fullness and pain" and had swollen nasal mucosa and postnasal drainage.

169.     On December 18, 2019, Mr. Rogacki submitted a grievance in which he once again laid out the status of his connected sinus and dental problems at length, including his dental history, his dizzy spells and headaches, his past visit to the ENT at St. Anthony's Hospital in October 2019, his inappropriate treatment for allergies by medical staff at JCJ, his need for surgery to correct his sinus problems per the ENT, and his difficulty in obtaining necessary follow-up visits to the ENT.

170.     The JCJ medical staff deliberately ignored and/or disregarded the December 18th grievance. The unsigned response to the grievance, dated April 2, 2020 (over three months after the grievance was submitted), states only, "[i]nmate released from JCSO."

171.     On December 19, 2019—almost a full month since Mr. Rogacki had last seen a higher-up medical provider, despite his documented worsening condition and symptoms and lack of any current treatment—Mr. Rogacki was finally seen by Defendant Dr. Dar (again). Mr. Rogacki reported his frustrations with the medical staff's failure to provide the necessary follow-up visit with an ENT, his continuing nasal drainage, and his worsening headache on the left side of his sinuses.

172.     Dr. Dar's assessment of Mr. Rogacki included "[a]cute on chronic recurrent sinusitis" and "ongoing concerns about ENT referral."

173.     Dr. Dar's written plan for Mr. Rogacki included a two-week prescription for the antibiotic Bactrim, the use of a decongestant, and "confirmed ENT referral being scheduled."

174.     On January 15, 2020, Wellpath Administrative Assistant Jamie Guzman made a chart entry for Mr. Rogacki indicating that he had been scheduled for a follow-up ENT appointment on February 6, 2020—after Mr. Rogacki's release date.

175.     On January 20, 2020, Mr. Rogacki was released from JCJ, having never received the teeth extraction, follow-up appointment with an ENT, or the maxillary sinus surgery that he obviously needed while he was incarcerated at JCJ.

176.     **Every serious symptom exhibited by Mr. Rogacki and serious complaint of Mr. Rogacki that is detailed above was recorded in his jail medical record on or about the date it occurred, so that each medical professional who treated Mr. Rogacki and/or responded to his written medical requests and the like subsequent to the entry in his health record had knowledge of Mr. Rogacki's worsening condition.**

177.     It is standard practice in the medical profession for a patient's medical provider to review the patient's relevant medical records as part of their evaluation of the patient. That is what each Individual Defendant did or, at the very least, knew they should have done here with respect no Mr. Rogacki.

178.     Thus, numerous members of the JCJ medical staff, including Individual Defendants, were aware of Mr. Rogacki's need for additional treatment, and particularly of his

need for his teeth to be promptly extracted, need for follow-up appointments, and likely need for surgery with an outside ENT specialist.

179. Though numerous members of the medical staff advised Mr. Rogacki to notify medical of any changes or concerns with his condition, and Mr. Rogacki very frequently did so, he was met at every turn with indifference and often was outright ignored, even when the medical treatment he asked for had been recommended by the outside specialist that he had seen on October 3, 2019, and knowledge of those recommendations had been confirmed in writing by the JCJ medical staff.

180. As a result of the Individual Defendants' continual and knowing failure to appropriately treat Mr. Rogacki's related sinus infection and dental needs, as well as their continual failure and even active refusal to obtain appropriate care through outside providers for Mr. Rogacki's obvious and known medical issues, Mr. Rogacki was forced to suffer months of excruciating and frightening symptoms as he waited out his sentence.

181. Because Mr. Rogacki's condition was not handled in a timely nor appropriate manner—Defendants deliberately did not obtain a full-mouth extraction nor otherwise adequately address his infection—Mr. Rogacki foreseeably suffered an ongoing, very painful infection for over a year.

182. Moreover, Mr. Rogacki's maxillary sinuses and jaw were extensively, permanently, and foreseeably damaged as a result of each individual Defendant's deliberately indifferent delay in necessary treatment and surgery, including but not limited to the intentional failure of each Individual Defendant to ensure that his remaining teeth were promptly extracted.

183.     Each individual Defendant's conscious disregard of Mr. Rogacki's serious and obvious medical needs foreseeably caused him substantial harm.

184.     None of the Individual Defendants nor any other JCJ or Wellpath employee or contractor received any discipline or counseling related to the unconstitutional delay in providing necessary medical care to Mr. Rogacki.

185.     The Entity Defendants trained the Individual Defendants to conduct themselves in the manner that they did with respect to Mr. Rogacki, and these Defendants' actions were pursuant to the training, customs, practices and policies of the Entity Defendants.

**E.  Defendants Jefferson County's and Wellpath's customs, policies, and/or practices of deliberate indifference to inmates' serious medical needs caused Mr. Rogacki's harm and the violation of his constitutional rights.**

186.     At all times relevant to the subject matter of this Complaint, Defendant Jefferson County contracted with Wellpath to provide medical care and services to detainees at JCJ, as well as medical personnel.

187.     For at least ten years before the incidents at issue in this Complaint, and continuing through the present, Defendant Jefferson County has maintained such a contract with Wellpath (including when Wellpath was known as CHC, CCS, and/or CHM).

188.     Defendants Jefferson County and Wellpath maintained constitutionally deficient policies and practices and neglected to adequately train and supervise their employees with respect to the proper procedures for the evaluation and treatment of JCJ detainees' and inmates' serious medical needs.

189.     The contract between the Entity Defendants financially incentivizes reductions in the use of necessary off-site medical services for inmates, and as such, represents an

unconstitutional policy which gives rise to entity liability.

190. Under the agreement, Wellpath is contractually obligated to pay up to a certain amount of expenses for off-site medical care for each inmate.

191. Such a provision invites reckless risk-taking to save money—it expressly offers an incentive to deliberately disregard known and excessive risks to an inmate's health or safety—including the risk that they may die or suffer without timely off-site care.

192. Additionally, the Entity Defendants failed to adequately train and supervise its medical staff, amounting to deliberate indifference to the serious medical needs of inmates.

193. Staff are deliberately indifferently trained and allowed to follow a custom of deliberately disregarding history given by patients as being faked to get out of jail. Likewise, staff are trained to adopt a reckless "wait and see" approach when a patient presents with serious and potentially emergent symptoms rather than provide timely off-site care. Individual Defendants' failure to provide Mr. Rogacki timely off-site medical care is a direct result of these customs and training.

194. It was well known by the Entity Defendants prior to Mr. Rogacki's receiving deficient medical care at JCJ that there was a widespread pattern and practice of deliberately indifferent medical care at JCJ, as well as other facilities at which Wellpath provided medical services.

195. The Individual Defendants' violation of Mr. Rogacki's Eighth Amendment right to be free from deliberate indifference to his medical needs, standing alone, is sufficient evidence of the Entity Defendants' custom, policy, or practice of deliberate indifference because all Individual Defendants acted in essentially the same unconstitutional manner, each adhering to

what he or she based upon training knew to be standard operating procedure, policy, and customary practice.

196.     The Entity Defendants' policy and/or custom of deliberate indifference and their lack of adequate training, supervision, and discipline regarding meeting the serious medical needs of those in custody at JCJ is further evidenced by the following incidents.

197.     On May 1, 2020, Paul Abeyta died while incarcerated at JCJ as a result of complications from opioid withdrawal. Mr. Abeyta informed the detention staff that he had been a daily heroin user for the past five years and he had been suffering from symptoms including fever, cough, and shortness of breath. Mr. Abeyta was transferred to the medical unit of the jail where he was supposed to be routinely observed. Mr. Abeyta's symptoms progressed due to his withdrawals. Mr. Abeyta died in his cell after not receiving adequate medical care in response to his obvious withdrawal symptoms while he was supposedly under "observation" in the medical unit of the jail.

198.     On March 28, 2019, John Kowalski also died from complications of opiate withdrawal due to JCJ and Wellpath staff's deliberate indifference to his serious medical needs, while he was a pre-trial detainee at the JCJ. While in custody, Mr. Kowalski, suffering from opiate withdrawal, passed out and had a seizure in the shower. Mr. Kowalski's conditions were communicated to JCJ staff and Wellpath medical personnel responsible for caring for Kowalski. However, JCJ and Wellpath staff did not provided adequate medical care nor life-preserving checkups on his condition. As a result, he became gravely ill and went into cardiac arrest. He died a week later at the hospital

199.     On March 2, 2015, Jennifer Lobato died as a result of dehydration stemming from opiate withdrawal-related complications while being detained at JCJ. Soon after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from methadone, including vomiting profusely. Ms. Lobato's symptoms progressively worsened. JCJ staff refused to respond to provide Ms. Lobato with the medical care she needed. As a result, Ms. Lobato died alone in her cell. Ms. Lobato's estate filed suit against several individual defendants, as well as Jefferson County and CCS. Jefferson County and the deputy defendants settled with Ms. Lobato's estate for $2.5 million prior to trial and claims against the CCS Defendants settled for a confidential amount.

200.     In 2013, Kenneth McGill sued Jefferson County and Wellpath (then known as CHC) after he was denied medical treatment at JCJ while exhibiting obvious signs of a stroke in September 2012. Mr. McGill complained JCJ staff of dizziness, slurred words, and difficulty maintaining balance. JCJ and CHC staff, acting with deliberate indifference, failed to take Mr. McGill to a hospital in a timely fashion where he could have received necessary emergency medical care. This case went to trial and resulted in a plaintiff's verdict for approximately $11 million. The jury also found that CHC had constitutionally deficient training and supervision of nurses in JCJ.

201.     In November 2010, Robert Turley choked on some food, thereafter complaining of sharp pain and throwing up blood. JCJ staff and CHC's medical staff were deliberately indifferent in refusing his request to see a doctor and be transported to the hospital. Only once he was found hypoxic and unconscious was he sent to the hospital, where he was found to have a perforated esophagus requiring surgery. Although Mr. Turley survived, he had significant

medical issues that resulted from mistreatment.

202.     In addition to the JCJ-specific incidents described above, because Defendant Wellpath is a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates at correctional facilities at which it contracts, there is an abundance of examples nationwide establishing that Wellpath and the entities that employ it have policies, customs, and practices demonstrating deliberate indifference to the medical needs and constitutional rights of inmates, specifically, a dangerous "wait and see" policy/custom/practice of failing or delaying to send inmates for necessary off-site medical care to treat obvious and serious medical conditions.

203.     Indeed, a CCS medical director at Richland County's Alvin S. Glenn Detention Center testified in a 2014 deposition that the company made it clear that employees who "run up the tab" wouldn't be around very long. He described pressure from both the county and CCS to limit emergency room transfers because of the "severe expense" involved.

204.     A 2019 report by CNN (on Wellpath's predecessor CCS) concluded that "internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees, and scathing correspondence from government clients show that amid a focus on 'cost containment' and massive corporate growth, [CCS] has provided substandard care that has led to deaths and other serious outcomes that could have been avoided." The report found that "[a]cross the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases. CCS employees have denied urgent emergency room transfers. They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become

fatal." [2] Numerous examples of such substandard and unconstitutional care exist.

205.     For example, in 2013, a multiple plaintiff case was filed against CHC-related companies arising out of three deaths and one near death in the Tulsa County Jail resulting from inadequate medical care and refusals to obtain needed outpatient and emergent services for prisoners (*Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al*., Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.)). One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms. Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport. A third detainee, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied.  The incidents were caused by is a longstanding policy, practice, or custom at the jail of Wellpath's predecessor companies (CHC etc.) refusing to send inmates with emergent needs to the hospital for purely financial purposes.

206.     Additionally, Earl Williams died at the Tulsa County Jail after he was known to have gone days without food or water. Mr. Williams' serious and known medical needs were ignored by CHC medical staff because there was an inappropriate "faking or malingering" diagnosis that prevented him from receiving timely hospital care. Expressly concluding that he was faking paralysis, the CHC nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. Before he died, staff threw food at Mr. Williams and put water just outside his reach.  Mr. Williams' death was caused by CHC-related defendants' maintaining a policy,

---

[2] Blake Ellis and Melanie Hicken, *A CNN investigation exposes preventable deaths and dangerous care in jails and prisons across the country*, CNN (June 2016), https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

practice, and/or custom of severely limiting the use of off-site medical, mental health and

diagnostic service providers, even in emergent situations, in deliberate disregard to the known,

obvious and excessive risks to the health and safety of inmates.

207. CHC-related entities at the Tulsa Jails had previously been subject to the

following high-level reports of constitutional deficiencies:

a. In 2007, the National Commission on Correctional Health Care ("NCCHC") auditors reported serious and systemic deficiencies in the care provided to prisoners by CHC related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner."

b. In 2008, the Department of Justice found that the jail medical program, administered by a CHC related entity, was constitutionally deficient in a number of regards. Specifically, among other things, the DOJ found that there were "critical lapses in getting emergency medical care to detainees." DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "[it] generally did not observe improved conditions at the time of the second tour."

c. In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies continued unabated by CHC-related companies despite the abundant notice of the same from NCCHC and DOJ.

d. In 2010, NCCHC performed another audit. NCCHC found deficient care, deficient investigation into deaths, and lack of timely diagnostic and specialty services. Even after this audit, CHC did not follow the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified, despite high-level CHC workers repeatedly bringing to corporate CHC attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions.

e. In November 2011, the jail's own retained auditor found the same deficiencies in care.

f. In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CHC and related companies and reported that it had found a prevailing attitude among clinic staff of indifference, and nurses were undertrained and failure to evaluate patients properly.

208. The Tulsa jail medical care and policies and practices were overseen by the same

high-level corporate executives as those overseeing Wellpath programs at other detention centers, at which the same unconstitutional policies, customs, and practices were instituted, leading to similar constitutional violations.

209.    For example, 18-year-old Marc Moreno died in 2016 in Benton County Jail (Oregon) after CCS medical staff unconstitutionally denied him medical care despite his alarming, emergent symptoms. Mr. Moreno was suffering from a known mental health crisis when he was detained, and he was observed by jail staff not eating or drinking for days. When a CCS nurse at the jail observed him, knowing that he had not had food or drink for four days at that point, she not only failed to contact a provider or send him off-site for emergency treatment, she also did not even take his vital signs. The next day, he was found dead in his cell; he had lost 38 pounds in the 8 days he had been detained. After his family sued CCS, a court found that CCS had destroyed thousands of potentially incriminating documents in the case before they could be produced. Wellpath settled the lawsuit for $4.5 million.

210.    Henry Clay Stewart died a preventable death from a perforated ulcer at Hampton Roads Regional Jail in Virginia in 2016 after seeking medical assistance from CCS medical staff for almost a month; he reported abdominal pain, blackouts, and inability to keep down food or water. Despite his persistent, concerning symptoms, medical staff acted with deliberate indifference to his serious medical needs by refusing to send him off-site for care. A Department of Justice investigation found that there was reasonable cause to believe that the jail failed to provide inmates with constitutionally adequate medical care, citing Mr. Stewart's death, among several other deaths from lack of insufficient medical care, as evidence of its finding. The DOJ found that before Mr. Stewart slowly bled to death, medical staff ignored his complaints because

they determined that he had already been seen at the hospital—very similar to Individual Defendants' refusal to provide Mr. Rogacki with adequate medical treatment for the asserted reason he had already been seen by an ENT.

211.     Alisant Scott lost her breast to a mastectomy in 2016 after being detained in Oakland County Jail (Michigan), where CCS medical staff denied her obviously necessary evaluation and treatment in response to her complaints of agonizing due to a knot in her breast growing to the size of a baseball. Ms. Scott was prescribed a basic antibiotic that medical records show did little to combat a dangerous MRSA infection inside her breast; she pleaded with medical staff for help for two weeks before being forced to undergo the mastectomy, and the unconstitutional delay in adequate care and treatment was likely the reason she lost her breast and suffered weeks of excruciating pain.

212.     In 2016, 59-year-old Paul Clifton Jr. died in an Illinois jail after a jail sergeant who was about to call an ambulance for him due to his difficulty breathing was told by CCS employees that his condition had improved and that it was unnecessary to send him out. Even though Mr. Clifton's blood pressure remained dangerously high and he complained of chest pains, CCS staff refused to call an ambulance until he was unresponsive. Mr. Clifton's death was caused by CCS medical staff's deliberate indifference to his obvious and serious medical needs, as well as CCS's policy, custom, and/or practice of not or delaying in obtaining obviously necessary off-site care for inmates with serious medical conditions.

213.     Jeffrey Lillis died at 37 years old at the Arapahoe County Detention Facility on December 14, 2014, as a result of deliberate indifference to his known serious medical needs by, among others, a CCS/CHC/CHM-contracted physician. Mr. Lillis died of sepsis and severe

bacterial pneumonia, easily treatable conditions that would not have killed him had he been provided him with proper and timely medical attention and treatment. Yet despite learning of the serious nature of his symptoms, the physician failed to timely order that Mr. Lillis be transported off-site for the necessary medical evaluations and care, leading (among other actions by jail medical staff) to Mr. Lillis's death. The state medical board later found that the doctor had acted below generally accepted standards of practice. A claim against the physician and CCS/CHC/CHM was settled by CCS/CHC/CHM for a confidential amount.

214. In August of 2014, CHC-related defendants unconstitutionally caused the death of John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his obvious and serious medical condition. Involved staff deliberately disregarded his obvious malnourishment and dehydration and withdrawal related conditions due to the jail's and CHC's denial of the prescription medication he had been taking before he was detained, and recklessly refused to transport him to the hospital for necessary emergency treatment. He died on the floor of his cell, weighing 30 pounds less than when he was brought to the jail three weeks earlier.

215. In April of 2014, Thomas Beauford died at Mesa County Detention Facility due to deliberate indifference to his obvious and serious medical needs by CCS (or related companies). Throughout his time at the jail, Mr. Beauford demonstrated clear signs of epilepsy. Because of the failure to provide him adequate care, Mr. Beauford's condition rapidly deteriorated on April 15, 2014, into the morning of April 16, 2014. Though Mr. Beauford's need for immediate medical attention was obvious, at no time was he provided with medical attention or treatment. Alone in his cell, Mr. Beauford ultimately had a series of seizures, fell off of his bed, and died with his head jammed underneath his desk. Mr. Beauford's death could have undoubtedly been

prevented had jail medical staff provided him with prompt and appropriate medical attention and treatment.

216.    An investigation into David Courtney's 2014 death after his detention in Montgomery County Jail, where CCS was the medical care provider, resulted in the Texas Commission on Jail Standards finding that the jail did not meet minimum standards. The conclusion was based in part on the fact that Mr. Courtney received clearly unconstitutional care when CCS waited nearly two months to send him to see a doctor despite at least four notes in his chart about blood in his stool.

217.    On June 3, 2013, Tanya Martinez, died alone in a lockdown jail cell at Pueblo County Detention Facility from an alcohol withdrawal related seizure at the age of thirty-six. Ms. Martinez's preventable death occurred after she displayed obvious signs of withdrawal, including shaking, nausea, vomiting, sweating, and rapid pulse. Among other acts and omissions of deliberate indifference, jail and CHC medical staff failed to regularly monitor Ms. Martinez's condition, unconscionably delayed giving her medication, provided insufficient medication, failed to transport her to a hospital despite her obvious need for emergent care, and, just minutes before her death, ignored a call for medical to check on her.

218.    In 2012, CCS medical staff ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell in Wichita County Jail. CCS staff recklessly failed to transport her to the hospital for safe delivery. When delivered, the baby was purplish and in need of medical attention, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

219. In 2009, Charles Holdstock died after the medical staff of a CCS-related company at Oklahoma County Jail ignored lab results that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication). Instead, jail medical providers acted with deliberate indifference by waiting to take Mr. Holdstock to the hospital despite the alarming test results and related symptoms. Mr. Holdstock was found unresponsive on his cell floor and later died in a hospital emergency room.

220. A common thread in these cases is that Wellpath and its predecessor companies ignored obvious signs and symptoms to deny inmates access to necessary offsite medical care.

221. Defendant Jefferson County, in contracting with Wellpath to provide medical care at the JCJ, knew or should have known of Wellpath's significant history and pattern of serious deficiencies in providing medical services and care to detention facility inmates, and refusals by Wellpath to correct such deliberately indifferent policies, practices, and customs. Defendant Jefferson County is liable for the selection and years-long retention of Wellpath to provide medical services at JCJ despite such knowledge, which demonstrated shocking indifference to the health and safety of JCJ inmates in its jail given what it knew to be a history of unconstitutionally inadequate medical care in correctional and detention facilities.

222. Defendant Jefferson County also had a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees, which it violated when JCJ and Wellpath medical staff did not provide Mr. Rogacki the timely offsite care that he needed to treat his serious medical condition.

223. Defendant Jefferson County intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party—namely, Wellpath and its related entities.

224. Defendant Jefferson County is liable for the unconstitutional actions of Defendant Wellpath (including its defective customs, policies, and practices described herein that were the moving force behind the violations of Mr. Rogacki's constitutional rights) and its employees or contractors toward Mr. Rogacki.

225. Based on the numerous incidents detailed above of constitutionally deficient medical care and treatment provided by one or both of the Entity Defendants, and the absence of accountability and adequate training and supervision, the Entity Defendants knew or should have known that JCJ medical staff would display deliberate indifference to the serious medical needs of JCJ inmates, including but not limited to the failure to obtain timely necessary off-site care for obvious and serious medical conditions.

226. Further, JCSO's and/or Wellpath's deliberately indifferent policy, custom, and/or practice of failing to discipline, and thereby condoning, encouraging, tolerating, rewarding and ratifying such deliberate indifference, has resulted in a custom or culture of inadequate medical care at JCJ because JCSO and/or Wellpath has explicitly or implicitly communicated to staff, including Individual Defendants, that such lack of care is authorized and, indeed, expected, and when used will be defended by the supervisory and municipal apparatus of JCSO and/or Wellpath.

227. The approval and defense by JCSO and/or Wellpath of deliberate indifference by JCJ medical staff sends a clear and unequivocal message to those employees—it *trains* them—

that such deliberate indifference is acceptable, consistent with policy, and is approved practice, causing it to be likely or even inevitable in the future.

228. In light of their knowledge of constitutionally deficient care, the Entity Defendants could have and should have changed their policies and/or pursued reasonable methods for training, supervising, and disciplining JCJ staff regarding meeting the serious medical needs of JCJ inmates, but the Entity Defendants made a conscious and deliberate choice not to do so.

229. The Entity Defendants' unlawful conduct regarding their deliberate indifference in meeting the serious medical needs of inmates constitutes a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

230. The Entity Defendants' failure to discipline or counsel any of the Individual Defendants or for their deliberate indifference to Mr. Rogacki's serious medical needs demonstrates that their conduct was carried out pursuant to the customs, policies, practices, and regiment of training of JCSO and/or Wellpath, and that such conduct is customary with JCSO and/or Wellpath. Had such conduct not been customary and pursuant to approved policy, the Entity Defendants would have taken disciplinary or ameliorative action.

231. Because the Entity Defendants created, tolerated and, at times, encouraged a custom of deliberate indifference to inmates' serious medical needs and continuously failed, despite the obvious need to do so, to adequately train, discipline, and supervise staff in this area, individuals including Mr. Rogacki have repeatedly been subjected to violations of their constitutional rights.

232. The Entity Defendants knew or should have known that their acts or omissions in

failing to provide adequate medical care to meet the serious needs of inmates were substantially certain to cause JCJ staff (including Wellpath employees or contractors) to violate individuals' constitutional rights, and the Entity Defendants consciously or deliberately chose to deliberately disregard this obvious risk of harm in adhering to their policies and/or customs of, among other things, failing to provide additional or better training and supervision to JCJ staff regarding meeting inmates' serious medical needs, including but not limited to the need to obtain timely off-site care for serious medical conditions.

233. The Entity Defendants were deliberately indifferent to Mr. Rogacki's constitutional rights because they knew that individuals in Mr. Rogacki's position would be at substantial risk of suffering dangerous consequences from, among other things, their failure to adequately train and supervise JCJ staff in meeting the serious medical needs of inmates, yet they failed to take adequate action to rectify this deficiency.

234. The circumstances attendant to Mr. Rogacki's detention and health crisis are foreseeable in the jail setting, sufficiently recurring as to place the Entity Defendants on clear notice that training, policies, and practices must be developed and enforced to avoid the violation of the constitutional rights of detainees who may be incarcerated at JCJ.

235. The need for such training and the probability that the failure to provide such training would cause a JCJ inmate like Mr. Rogacki to be seriously injured was so obvious that Entity Defendants' failure to do so constituted deliberate indifference to Mr. Rogacki's serious medical needs.

236. Mr. Rogacki's lasting serious injuries were the result of longstanding, known systemic deficiencies in the medical care provided to inmates by the Entity Defendants, and the

Entity Defendants' unconstitutional policies, customs, or practices described above regarding providing medical care to inmates were the moving force and proximate cause of Individual Defendants' violating Mr. Rogacki's constitutional right to be free from deliberate indifference to his serious medical needs.

237. The Entity Defendants' deliberate indifference to his serious medical needs caused Mr. Rogacki substantial damages.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of the Eighth Amendment
### Failure to Provide Medical Care and Treatment
### (Against all Defendants)

238. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

239. At all times relevant to the allegations in this Complaint, Defendants acted under color of state law.

240. At all relevant times, the described conduct of the Individual Defendants was taken within the course and scope of their official duties and employment.

241. Defendant Wellpath, at all relevant times, was acting under color of state law, as the functional equivalent of a municipality providing medical care to detainees.

242. At all relevant times, Mr. Rogacki was a detainee subject to the protections of the Eighth Amendment to the United States Constitution.

243. Mr. Rogacki had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs and to receive adequate medical care while in the custody of JCSO.

244.     Each Individual Defendant knew or should have known of these clearly established rights at the time of Mr. Rogacki's detention at JCJ.

245.     Mr. Rogacki was in obvious and serious need of medical care and treatment throughout his detention at JCJ.  Defendants failed to provide such medical care.

246.     The Individual Defendants deliberately and intentionally withheld the medical care Mr. Rogacki needed.

247.     The Individual Defendants failed to take reasonable available measures to abate the serious and obvious risk to Mr. Rogacki. A reasonable official in the circumstances would have appreciated the high degree of risk involved, making the consequences of the Individual Defendants' conduct obvious.

248.     At all times relevant to the allegations in this Complaint, each Individual Defendant knew of and deliberately disregarded the excessive risks associated with the failure to inadequately treat Mr. Rogacki's serious medical condition.

249.     With deliberate indifference to Mr. Rogacki's constitutional right to adequate medical care for his known serious medical needs, as provided by the Eighth Amendment to the United States Constitution, Individual Defendants knowingly failed to adequately and timely examine, treat, evaluate, monitor, supervise, and/or obtain medical care for Mr. Rogacki obvious and serious medical needs, or to intervene to ameliorate other Defendants' deliberate indifference to the obvious serious medical needs of Mr. Rogacki. They did so despite their knowledge of Mr. Rogacki serious medical needs, thereby placing him at risk of serious physical harm.

250. Therefore, the Individual Defendants knew or were aware that Mr. Rogacki faced a substantial risk of serious harm and deliberately disregarded this excessive risk by failing to take measures to reduce it.

251. By not taking such measures, the Individual Defendants caused Mr. Rogacki's substantial pain and injuries.

252. As described with particularity above, the Entity Defendants are liable for their deliberately indifferent policies, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Mr. Rogacki. The Entity Defendants have a widespread pattern of deliberately indifferent medical care at JCJ and, as to Defendant Wellpath, other correctional facilities at which it provides medical services.

253. Defendant Jefferson County is directly liable for its own deliberately indifferent policies, customs, and practices that were moving forces in Mr. Rogacki's constitutional injury, as well as its deliberately indifferent training and supervision of nurses, its own role in setting policy regarding medical care at JCJ, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference to JCJ detainees' known serious medical needs.

254. Defendant Jefferson County is also liable under the nondelegable duty doctrine for the deliberately indifferent policies, customs, practices, training and supervision of the private companies with which it contracts to provide medical care to JCJ detainees, including Wellpath.

255.     As described in detail above, the Entity Defendants' deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving forces in the violation of Mr. Rogacki's constitutional rights.

256.     The Entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed off-site and other necessary medical care to inmates with serious medical needs causing injury and death.

257.     The Entity Defendants' failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant detainees and a moving force in the complained of injuries and suffering of Mr. Rogacki.

258.     The Entity Defendants, through policy makers and final delegated decision-makers, ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of failing to provide and delaying treatment for inmates' serious and known medical conditions.

259.     The ratification of this conduct evidence that the conduct that caused Mr. Rogacki's injuries was engaged in pursuant to policy, custom, and practice of the Entity Defendants.

260.     Ratification of previous instances of deliberate indifference to medical needs, however, was a causal factor in the subsequent use of deliberate indifference to medical needs regarding Mr. Rogacki, as the employees and/or contractors of the Entity Defendants are trained and taught that such conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

261.    Therefore, the Entity Defendants set in motion a series of events that they knew would cause an inmate in a similar situation as Mr. Rogacki to be deprived of his constitutional right to adequate medical care for his known serious medical needs. But for the above acts or omissions of the Entity Defendants, Mr. Rogacki would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

262.    The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Mr. Rogacki's constitutional right to receive adequate medical care for his known serious medical needs.

263.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Mr. Rogacki's injuries and losses, including but not limited to his permanent injuries, the physical and mental pain he suffered due to the lack and delay of treatment, the loss of his constitutional rights, the loss of enjoyment of life, and other compensatory and special damages including but not limited to medical expenses and lost earnings and earnings capacity.

264.    The herein described acts and inactions were taken by the Individual Defendants in reckless and callous indifference to the federally protected rights of Mr. Rogacki, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Rogacki's constitutionally protected rights.

265.    The actions of Defendants as described herein intentionally deprived Mr. Rogacki of rights, privileges, liberties, and immunities secured by the Constitution of the United States of

America, and caused him other damages, including severe pain and suffering and permanent injury.

## SECOND CLAIM FOR RELIEF
### Negligence
### (Against the Individual Defendants and Wellpath)

266.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

267.    At all times relevant, Wellpath was a private corporation that contracted with Jefferson County to provide medical care and health services to inmates at JCJ, and Wellpath is not entitled to immunity under the CGIA.

268.    At all times relevant, Individual Defendants were private individuals employed or contracted by Wellpath and thus are not entitled to immunity under the CGIA.

269.    At all times relevant, Mr. Rogacki was in the involuntary custody of JCJ, and under the medical responsibility, care and treatment of Individual Defendants.

270.    Individual Defendants had a duty to provide reasonable medical care and treatment to detainees at JCJ, including Mr. Rogacki.

271.    The Individual Defendants had a physician-patient, nurse-patient, or dentist-patient relationship with Mr. Rogacki at all relevant times and were acting within the scope of their employment throughout the duration of that relationship.

272.    With respect to their care and treatment of Mr. Rogacki, the Individual Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

273.     Wellpath had a duty to exercise reasonable care in providing medical care and treatment to JCJ detainees, including Mr. Rogacki, and to exercise reasonable care in the training and supervision of Wellpath's employees.

274.     These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required medical treatment." The provision of adequate medical treatment and humane care is a statutory (as well as constitutional) obligation.

275.     Individual Defendants breached their duty of care to Mr. Rogacki and deviated from the standard of care they owed him when they failed to timely provide him with reasonably obtainable and necessary medical assessment, monitoring, care, and treatment.

276.     As a direct and proximate result of the Individual Defendants' breach of their duty to provide reasonable care and treatment to Mr. Rogacki, he suffered significant physical and mental pain and suffering, permanent injury, and other damages.

277.     Wellpath is sued directly and indirectly for negligence, negligent supervision, and negligent training of its staff; for failing to ensure the provision of appropriate care in the treatment of Mr. Rogacki; for the acts and omissions of its agents and/or employees; and for the herein described acts by its involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

278.     Wellpath is vicariously liable for the negligent acts and omissions by its non-physician agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for negligent failures in training, policies, and practices.

279.     Wellpath is directly liable for breaching its duty to exercise reasonable care in its training and supervision of its employees and agents and JCJ staff in a manner that provided JCJ detainees with reasonable medical care and treatment.

280.     Wellpath knew or should have known that the lack of adequate supervision and training of its employees and agents and JCJ staff was likely to harm JCJ detainees in need of medical care, like Mr. Rogacki.

281.     In failing to exercise reasonable care in the training and supervision of its employees and agents and JCJ staff, as it relates to their providing reasonable medical care and treatment, Wellpath was negligent and proximately caused Mr. Rogacki's harm.

282.     The negligent acts and omissions by the Individual Defendants and Wellpath were a substantial and significant contributing cause of Mr. Rogacki's permanent injury and suffering, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Mr. Rogacki suffered.

283.     As a direct and proximate result of the negligent conduct of the Individual Defendants and Wellpath, Mr. Rogacki suffered significant permanent harm and physical and mental pain and suffering and other damages.

284.     Mr. Rogacki suffered and continue to suffer economic and non-economic damages due to these Defendants' negligent conduct, including but not limited to economic damages for medical expenses and lost wages, and non-economic damages for impairment in the quality of his life, inconvenience, pain and suffering, and extreme emotional stress.

285.     Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Mr. Rogacki.

286.     Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause harm to another.[3]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and award all relief allowed by law and equity, including but not limited to the following:

(a)     Declaratory relief, injunctive relief, and other appropriate equitable relief as appropriate;

(b)     Economic losses on all claims as allowed by law in an amount to be determined at trial;

(c)     Compensatory and consequential damages, including damages for emotional and physical distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims as allowed by law in an amount to be determined at trial;

(d)     Punitive and exemplary damages on all claims allowed by law and in an amount to be determined at trial;

(e)     Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

---

[3] Given the circumstances of malice and willful and wanton conduct surrounding Defendants' treatment of Mr. Rogacki, Plaintiff anticipates seeking exemplary damages for Defendants' negligence once Plaintiff has established prima facie proof of a triable issue of exemplary damages.

(f)     Pre- and post-judgment interest at the appropriate and highest lawful rate; and

(g)     Any further relief that this court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 22nd day of February 2022.

KILLMER, LANE & NEWMAN, LLP

*s/ Michael Fairhurst*

_____
David Lane
Michael Fairhurst
Liana Orshan
1543 Champa St., Ste. 400
Denver, CO 80202
Phone: (303) 571-1000
Fax: (303) 571-1001
dlane@kln-law.com
mfairhurst@kln-law.com
lorshan@kln-law.com

ATTORNEYS FOR PLAINTIFF